IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| ANTHONY CRAWFORD, and | ) |
|---|---|
| HOWARD TESSMAN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 3:18-cv-1067-DWD |
| vs. | ) |
| | ) |
| SALVADOR GODINEZ, | ) |
| TY J. BATES, | ) |
| RANDY DAVIS, | ) |
| NORMAN SUITS, and | ) |
| JAMES BARNARD, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Plaintiffs Anthony Crawford and Howard Tessman bring Eighth Amendment conditions-of-confinement claims against Defendants, alleging that the conditions they suffered at the Dixon Springs Impact Incarceration Program violated their constitutional rights. Before the Court is Defendants' motion for summary judgment. (Doc. 73)[1] The motion is fully briefed and ripe for decision. (Docs. 74 & 80) For the following reasons, the motion is due to be granted in part and denied in part.

### I. FACTUAL BACKGROUND

In September 2010, Crawford was sentenced to a four-year term of imprisonment in the Illinois Department of Corrections ("IDOC") and a two-year term of supervised

---

[1] All record citations refer to the document and page number as designated by the Court's electronic filing system.

release with the option of participating in IDOC's Dixon Springs Impact Incarceration Program to receive a sentence reduction. (Doc. 74-11) Crawford chose to participate in the Dixon Springs program and was placed there from December 7, 2010, to April 6, 2011. (Docs. 74-1 & 74-14) In April 2012, Tessman was sentenced to a five-year term of imprisonment in IDOC. (Doc. 74-13) He also chose to participate in the Dixon Springs program and was placed there on September 2, 2012 but left four days later. (Docs. 74-2 & 74-15) Plaintiffs had the option to leave Dixon Springs at any time, but if they did so before they completed 120 days there, they would have to serve the remainder of their original sentence. (Docs. 74-10 at 27; 74-15)

Dixon Springs is a satellite facility of the Vienna Correctional Center and houses 302 inmates. (Doc. 74-9 at 4) According to the Inmate Orientation Manual, the primary goal of Dixon Springs

> is to promote lawful behavior in youthful offenders who are incarcerated for the first time, by providing a structured, specialized, program that develops responsibility, self-esteem, and positive self-concept while also addressing the underlying issues that often lead to criminal behavior. To accomplish this goal, the Impact Incarceration Program has designed a strict system of discipline.

(Doc. 74-9 at 8) The manual describes possible punishments for rules infractions, which include verbal counseling, various types of additional exercise, and a demerit system. (Doc. 74-9 at 8–9) When seeking entry to the program, inmates must sign a consent form indicating that they understand that the program consists of "mandatory physical training and labor, military formation and drills, regimented activities, uniformity of dress and appearance, [and] that privileges including visitation, commissary, receipt and

retention of property and publications and access to television, radio, and a library will be restricted." (Doc. 74-9 at 47) As the manual notes, "this program is not easy and is not something you can just 'walk' through." (Doc. 74-9 at 21) IDOC's website describes Dixon Springs as a boot camp that provides "labor intensive discipline." *Dixon Springs Impact Incarceration Program (IIP)*, Illinois Department of Corrections, https://www2.illinois.gov/idoc/facilities/Pages/dixonsprings.aspx (last accessed on July 13, 2021). In general, "[t]he idea is to give the inmates an experience similar to that of old-fashioned military basic training, in which harsh regimentation, including drill-sergeant abuse by correctional officers, is used to break down and remold the character of the trainee." *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996). "The leaders of training units must continue to develop self-discipline in their [participants]. Self-discipline begins early in boot camp by ensuring that the training center cadre maintains total control over the [participants'] activities." John K. Zachariah, *An Overview of Boot Camp Goals, Components, and Results*, in Correctional Boot Camps: A Tough Intermediate Sanction 17, 19 (Doris L. MacKenzie & Eugene E. Hebert eds., 1996). Many of the aspects of military basic training were described in the Plaintiffs' pleadings and testimony.

Crawford recalls starting his day at Dixon Springs by being awakened and standing in front of his bunk dressed only in his boxers. (Doc. 74-10 at 32) Then the inmates would exercise and eat breakfast. (Doc. 74-10 at 35–37) Inmates had to exercise every day outside regardless of weather. (Doc. 74-10 at 152) The officers made the inmates perform an exercise that required them to stand in front of a wall with their hands raised in the air for an indeterminate amount of time, sometimes more than 30 minutes and

sometimes outside wearing only their underwear. (Doc. 74-10 at 154) Crawford testified that they would be required to exercise outside in the cold and snow and that his fingers would become numb. (Doc. 74-10 at 58) None of the sessions lasted more than an hour. (Doc. 74-10 at 59)

After morning exercises, the inmates would be released by groups to use the bathroom. (Doc. 74-10 at 32) According to Crawford, if a tough officer was monitoring bathroom use, he might get only two or three minutes to shave, brush his teeth, and use the toilet. (Docs. 74-10 at 33; 74-18 at 44) Crawford testified that Defendant Barnard, a corrections officer at Dixon Springs, would give the inmates from two and a half to four minutes to defecate in the bathroom.[2] (Doc. 74-17 at 64–66) If one of the inmates in a group did not finish in time, then the guards would punish that inmate and his group with extra exercise.[3] (Doc. 74-10 at 34) Officers sometimes withheld mail as a form of punishment. (Doc. 74-10 at 166)

Typically, inmates would be permitted to use the bathroom four times a day, once after each exercise session and once after showering at night. (Doc. 74-10 at 38–40) If an inmate asked to use the bathroom outside of those times, the officers would give the inmate permission but would also punish the inmate with additional exercise. (Doc. 74-

---

[2] Throughout his testimony, Crawford used several different names, such as "Barnhart" and "Brenthart," to refer to Barnard. He testified that when he referred to "Barnhart" or "Brenthart," he was trying to say "Bernard." (Doc. 74-17 at 129) In their answer, Defendants clarified that the defendant's name is spelled "Barnard." (Doc. 16 at 1) Given that all reasonable inferences are to be made in the nonmovant's favor when deciding summary judgment, the Court infers that all of Crawford's references to "Barnhart," "Brenthart," and "Bernard" are references to Barnard.

[3] Barnard testified that generally more time would be given to an inmate who needed more time to finish using the bathroom. (Doc. 74-8 at 29)

10 at 39, 42–43) Inmates sometimes urinated or defecated on themselves because they were denied permission to use the bathroom. (Doc. 74-10 at 108). If that happened, they would not be given permission to change clothes. (Doc. 74-10 at 108–09) Crawford urinated on himself once for that reason. (Doc. 74-10 at 110) Crawford's one reprieve came when he was working in the kitchen, where he was able to use the bathroom whenever he wanted. (Doc. 74-10 at 54–55) The Dixon Springs manual requires that the inmates brush their teeth after every meal (Doc. 74-9 at 12), but the officers often did not let them do so. (Doc. 74-10 at 37–38, 90) Inmates were typically given no more than two minutes to shower at night. (Doc. 74-10 at 95)

Often, some of the showerheads did not work, so there would be nine or ten inmates crowded together to use the functioning showerheads.[4] (Doc. 74-10 at 99–100) The drains did not work well, so the showers had five to six inches of standing water and urine. (Docs. 74-10 at 100; 74-18 at 42) The drains were never fixed while Crawford was at Dixon Springs. (Doc. 74-10 at 127) Crawford believes that the fungal infections on his feet are due to the dirty shower water. (Doc. 74-10 at 102) The toilets had fecal stains on the seats and there were urine and toilet paper on the floor of the bathrooms. (Doc. 74-10 at 105) At one point during Crawford's time at Dixon Springs, three urinals were not working but took over a month to be repaired.[5] (Doc. 80-2 at 62) Crawford estimates that they were allotted about one roll of toilet paper a week. (Doc. 74-10 at 106) Sometimes

---

[4] Barnard testified that showerheads and toilets were repaired within a reasonable amount of time. (Doc. 74-8 at 18)
[5] Plaintiffs cite several other work orders that show toilets, urinals, and showerheads were often broken but took an excessively long time to repair. (Doc. 80 at 20) However, most of these work orders were filed and completed when neither Crawford nor Tessman were present at Dixon Springs.

5

Crawford and other inmates would tell some of the officers about the broken toilets or showerheads but avoided telling certain officers for fear of punishment. (Doc. 74-17 at 56–59)

The inmates were provided with three meals a day. (Doc. 74-10 at 44) Crawford testified that some of the meals were heavily seasoned to cover the taste of the spoiled food. (Doc. 74-10 at 140) Crawford reports that other inmates sometimes vomited onto their food trays. (Doc. 74-10 at 141) He had diarrhea once or twice after eating the food (Doc. 74-17 at 123) The officers had different, better food.[6] (Doc. 74-10 at 147) Tessman testified that he had spoiled milk on one occasion and noticed that other inmates had something wrong with their food. (Doc. 74-18 at 49–51) Tessman experienced diarrhea during and immediately after leaving Dixon Springs. (Doc. 74-18 at 54) Crawford testified that Barnard and other officers would make them eat quickly in about six or seven minutes, sometimes while standing up with one hand behind their back. (Doc. 74-17 at 79)

Upon arriving at Dixon Springs, Crawford received two pairs of pants, two blue shirts, a pair of boots, a winter hat, a baseball hat, three pairs of socks, three pairs of underwear, three undershirts, a jacket, and a sweatshirt and sweatpants. (Doc. 74-10 at 48–51) Crawford's and others' boots had holes in them and were too small. (Docs. 74-10 at 111–12; 74-18 at 55) His socks also had holes in them. (Doc. 74-10 at 144) Often, Crawford's socks and boots were wet, but he could not change them because he only had

---

[6] Barnard testified that officers ate the same food as inmates most of the time. (Doc. 74-8 at 24)

6

three pairs of socks total and only one pair of boots. (Doc. 74-10 at 144) Crawford's underwear had stains. (Docs. 74-10 at 114; 74-18 at 55)

The inmates were not permitted to wear their sweatpants to bed. (Doc. 74-10 at 50) At night, it was sometimes extremely cold because Barnard or another officer would leave a window open or leave fans on, even in the winter. (Docs. 74-10 at 60–61; 74-17 at 94) Crawford and others could see their breath at night in the dormitory. (Doc. 74-10 at 120) However, the inmates were not permitted to adjust the thermostats. (Doc. 74-9 at 13) But the officers had personal space heaters and fans and wore large coats and boots with heavy clothing.[7] (Doc. 74-10 at 94)

The inmates' beds included a pillow, a mattress, a fitted sheet, a second sheet, and a blanket. (Doc. 74-10 at 45) The inmates were permitted to wash their sheets once a month. (Doc. 74-10 at 111) The sheets had stains and holes in them. (Docs. 74-10 at 126; 74-18 at 33) There was mold in the dormitories, and water leaked onto beds in the dormitories.[8] (Docs. 74-10 at 96; 74-18 at 37–38) The mold was never cleaned while Crawford was at Dixon Springs. (Doc. 74-10 at 127)

Dixon Springs has a procedure for inmates to file grievances. (Doc. 74-9 at 10–11) However, Crawford never filed a grievance. (Doc. 74-10 at 45) He claims that he did not file a grievance because the officers would punish inmates who did so. (Doc. 74-10 at 116) Tessman never filed a grievance for the same reason. (Doc. 74-18 at 20–23)

---

[7] Barnard testified that he does not recall wearing a coat inside. (Doc. 74-8 at 31)
[8] Defendant Norman Suits, Superintendent of Dixons Springs, testified that there was a leak in the roof of a common area of the administrative building but could not recall any leaks in the dormitories. (Doc. 74-5 at 1)

7

Neither Crawford nor Tessman know any of the defendants except Barnard (Docs. 74-10 at 79; 74-18 at 78–79) Tessman testified that Barnard made him do excessive physical exercise. (Doc. 74-18 at 58) He also described an incident that occurred during an exercise session. While Tessman was running, Barnard punched or elbowed him in the side which caused him to trip, fall, and hit his head on the side of the track. (Doc. 74-18 at 68–69) He suffered dizziness, blurred vision, a mild concussion, and was urinating blood for two days. (Doc. 74-18 at 69) Barnard punished Crawford and other inmates by making them stand or lie down outside in the cold, rain, and snow. (Doc. 74-17 at 87–88) Barnard also withheld candy bars that Crawford and the other inmates had purchased from the commissary until the inmates did additional exercise. (Doc. 74-17 at 101)

Defendant Norman Suits was the Superintendent of Dixon Springs from August 2011 to October 2012. (Doc. 74-5 at 1) Suits maintains that he "walked the grounds daily to speak with staff and inmates and oversee the operation of the facility." (Doc. 74-5 at 1) He asserts that the facility was "clean and well-maintained." (Doc. 74-5 at 1) He does not recall any complaints about the food being spoiled or expired. (Doc. 80-4 at 14)

Defendant Randy Davis was the Warden of Vienna Correctional Center from December 2011 to June 2014 and had oversight of Dixon Springs. (Doc. 74-3 at 1) He would visit Dixon Springs at least once a week for one to two hours and would "look at sanitation, speak with staff and inmates, address any raised concerns or make note of any visible issues that required follow up, meet with the Superintendent of the facility, and observe meals." (Doc. 74-3 at 1) Davis also asserts that Dixon Springs was clean and well-maintained and does "not recall seeing instances of excessive exercise or abuse by

8

correctional officers." (Doc. 74-3 at 1)

Defendant Ty Bates was Deputy Director of the Southern Region of IDOC from December 2011 to June 2013 and was responsible for several facilities including Dixon Springs. (Doc. 74-7) He would typically visit Dixon Springs about once a month. (Doc. 74-7) On his visits, Bates would walk through the facility and speak with the staff casually but not about any institutional concerns. (Doc. 80-4 at 14) He also spoke with inmates about their concerns. (Doc. 80-4 at 15) He observed problems with the "overall physical condition of the facility," specifically a leak in the roof, and he testified simply that "Dixon Springs had issues." (Doc. 80-4 at 16) He was not sure if the roof was ever fixed, despite his efforts. (Doc. 80-4 at 18–19)

Bates recalls inmates complaining to him about the food, specifically that they were being served expired food and rotten milk. (Doc. 80-4 at 20–21) Bates immediately passed these concerns on to the warden or superintendent. (Doc. 80-4 at 21) He also reported the food complaints to the state dietary manager. (Doc. 80-4 at 35) He also recalls inmates complaining that there were too few bathrooms, that there was not enough time to use them, and that they needed repairs. (Doc. 80-4 at 22–23) He also recalls complaints about the building being drafty. (Doc. 80-4 at 27) He says that the warden and superintendent would frequently tell him about needed repairs in the bathrooms and he would try to get approval for those projects. (Doc. 80-4 at 25) Suits was the superintendent who would be touring with him and Davis would be with them most of the time. (Doc. 80-4 at 28–29) He also heard complaints from the inmates about the clothing being old, worn, and inadequate, but he does not recall them having holes. (Doc. 80-4 at 30–31)

9

Defendant Salvador Godinez was the director of IDOC from 2011 to 2015. (Doc. 74-6 at 17) During that time, he visited Dixon Springs. (Doc. 74-6 at 17–18) Godinez does not remember any details of the conditions at Dixon Springs. (Doc. 74-6 at 24) Plaintiffs concede that Suits, Davis, Bates, and Godinez were not employed by IDOC while Crawford was at Dixon Springs and that Crawford's claims against them should therefore be dismissed. (Doc. 80 at 5)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014) (citing Fed. R. Civ. Proc. 56(a)). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th

Cir. 2014).

The Eighth Amendment prohibition on cruel and unusual punishment forbids the unnecessary and wanton infliction of pain. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citation omitted). To succeed on a claim related to conditions of confinement, a plaintiff must establish both an objective and subjective element. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). As to the objective element, a prisoner must establish that the conditions deny him "the minimal civilized measure of life's necessities," creating an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To do so, he must show that the conditions resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care, sanitation, or physical safety. *See Rhodes*, 452 U.S. at 347. The Eighth Amendment "does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Rather, "extreme deprivations are required to make out a conditions-of-confinement claim." *Turner v. Miller*, 301 F.3d 599, 603 (7th Cir. 2002) (citations and quotations omitted). Courts "consider the totality of the conditions of confinement to determine whether a prisoner has been deprived of basic human needs." *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989).

The subjective component of a claim for unconstitutional conditions of confinement requires demonstrating that a defendant had a culpable state of mind, that is that a defendant acted with deliberate indifference to a substantial risk of serious harm to the prisoner. *See Farmer*, 511 U.S. at 837, 842. While mere negligence does not amount

11

to a constitutional violation, a plaintiff satisfies the deliberate indifference standard by showing that a prison official acted, or failed to act, despite the official's knowledge of a substantial risk of serious harm from the alleged unconstitutional conditions. *See Farmer*, 511 U.S. at 842; *Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). That is, prison officials must act to prevent "unreasonable peril" or to address "preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016).

## III.  DISCUSSION

Plaintiffs have produced evidence sufficient to generate a genuine issue of material fact regarding whether the conditions at Dixon Springs violated the objective component of an Eighth Amendment conditions-of-confinement claim.  Plaintiffs have also produced evidence sufficient to generate genuine issues of material fact regarding the deliberate indifference of Barnard, Suits, and Davis. Plaintiffs have not evidence that Bates or Godinez was deliberately indifferent, however, so summary judgment is due to be granted in favor of those two defendants.

### A.  Objective Component

Of all Plaintiffs' complaints regarding Dixon Springs, only one presents a plainly inadequate condition: the lack of hygiene in the dormitory showers. *See Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) (holding that a lack of sanitation can violate the Eighth Amendment); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) (holding that a prison must provide adequate utilities, including plumbing). The shower drains are alleged to have been consistently clogged for days at a time, resulting in several inches of standing

water. Because the inmates had little time and few opportunities to use the bathroom, they would sometimes urinate in the showers. As a result, Crawford, Tessman, and the other inmates were forced to use showers filled with standing water and urine. Crawford testified that these unhygienic conditions caused the fungal infections on his feet. Whether this correlation is true is one for a trier of fact. The Court finds that Crawford and Tessman have raised a triable Eighth Amendment claim concerning the conditions in the showers.

Crawford and Tessman have also described many other uncomfortable aspects of life at Dixon Springs. However, none of these conditions can be said to violate the Eighth Amendment. For example, courts have found that single incidents of exposing inmates to cold weather for hours at a time does not constitute an Eighth Amendment claim. *See, e.g.*, *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997); *Dunn v. FNU Mitchell*, No. 3:14-cv-719, 2015 U.S. Dist. LEXIS 8549 (W.D.N.C. Jan. 26, 2015); *Ray v. Schoo*, No. CV 10-942, 2014 U.S. Dist. LEXIS 1729 (C.D. Cal. Jan. 2, 2014), aff'd 592 F. App'x 590 (9th Cir. 2015). Here, Crawford testified that he was forced to exercise in the cold sometimes, but he also testified that workouts never lasted longer than an hour. And while he may have been cold at night, he was always sleeping indoors in his dormitory bed. The conditions he describes do not constitute the kind of prolonged, repeated exposure to extreme weather that would violate the Eighth Amendment.

Plaintiffs' claims regarding inadequate food, even accepted as true, do not make an Eighth Amendment claim. Jail officials must provide detainees with "nutritionally adequate food that is prepared and served under conditions which do not present an

13

immediate danger to the health and well-being of the inmates who consume it." *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)). Crawford testified that, although he was required to eat quickly, he received three meals each day while at Dixon Springs. While Crawford undoubtedly experienced some level of hunger, particularly given the program's physical demands, there is no evidence that the quantity of food he received was inadequate. Crawford also testified that he had "seen molded bread in the kitchen" a few times when he was assigned there but did not eat any. (Doc. 74-17 at 75) He also testified that he ate a danish after the food had expired and that he "got fired for eating a Danish." (Doc. 74-17 at 77) Crawford added that he had "like a little diarrhea from eating - - eating that spoiled food and stuff," but that occurred on only one occasion. *Id.* He "had like a stomach problem real bad and I was just going to the toilet." *Id.* He believed that the food was heavily seasoned to "cover up the taste of the spoiled food." (Doc. 74-17 at 81) Nothing in the record suggests that he reported his complaints about the either the food quantity or condition, nor did he seek medical treatment for his single bout with diarrhea.

Tessman also complains that the food at Dixon Springs "didn't taste right," because it was "over seasoned." (Doc. 74-18 at 49) He was given a carton of expired or spoiled milk but did not drink it. (Doc. 74-18 at 50) He did not vomit from the food provided at Dixon Springs but did have diarrhea for four to five days after leaving the program. (Doc. 74-18 at 54) While he did not testify specifically that the food there caused his diarrhea, he stated that he could not "see how it could have been anything else." (Doc. 74-12 at 32) The quality of the food may not have met their culinary standards, but

14

Crawford and Tessman fail to point to evidence that it was nutritionally inadequate or that it presented an immediate danger to their health and well-being.

Crawford and Tessman's remaining complaints are even less impressive. Poorly fitting clothes, intense exercise, and limited access to bathrooms certainly constitute uncomfortable conditions but they are incidental to and a component of the boot camp environment accepted by the Plaintiffs. As the manual and consent form make clear, Dixon Springs is a military-style program designed to teach inmates discipline and responsibility through an intense, demanding lifestyle. Inmates always have the option of leaving Dixon Springs and returning to a traditional detention center. These conditions also do not rise to the level of the extreme deprivations necessary to state an Eighth Amendment claim. Under these facts, the Court finds that Plaintiffs have raised a triable Eighth Amendment claim only as to the unhygienic conditions of the showers at Dixon Springs.

**B.      Subjective Component**

Plaintiffs have put forward no evidence showing that Godinez was aware of the conditions of the showers at Dixon Springs. Godinez said that he visited Dixon Springs while he was director of IDOC, but he could not recall any details of the conditions there. Neither Crawford nor Tessman know Godinez or could testify that he observed the conditions at Dixon Springs. Therefore, Plaintiffs have not satisfied the subjective component regarding Godinez, and Defendants' motion for summary judgment is due to be granted on the claims against him.

Bates has admitted that he received complaints from inmates at Dixon Springs

about the conditions there. He also testified that the warden and superintendent frequently informed him that the bathrooms needed repairs, and he tried to get approval for repair projects. "[R]easonable measures taken to avert known risks will insulate a prison official from Eighth Amendment liability, even if those measures proved unsuccessful." *Brown v. Ryker*, No. 10-cv-397-MJR-SCW, 2012 U.S. Dist. LEXIS 80861, at *10 (S.D. Ill. June 12, 2012) (citing *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)). Here, the evidence shows that Bates took reasonable measures to report the issues brought to his attention. And as he makes clear, it was difficult to obtain funding for capital improvement projects, despite his best efforts. Plaintiffs have provided no evidence that Bates' efforts to address concerns brought to his attention were unreasonable. Accordingly, Plaintiffs have also failed to satisfy the subjective component vis-à-vis Bates, and the motion for summary judgment is due to be granted on the claims against him.

Suits, Davis, and Barnard lack a similar excuse. "[P]rison officials cannot take refuge in *Farmer*'s subjective test by deliberately ignoring obvious risks: '[A] factfinder may conclude that a prison official knew of a substantial risk from the very facts that the risk was obvious.'" *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1977) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Although both Suits and Davis assert that Dixon Springs was "clean and well-maintained," they insist that they walked the grounds every day (Suits) or at least every month (Davis). Given the conditions of the showers at Dixon Springs as sworn to by Crawford and Tessman, the unhygienic conditions described by the plaintiffs would have been obvious to anyone who regularly toured the campus. Further, Bates testified that Davis and Suits told him that the bathrooms needed repairs.

16

Taking these facts in the light most favorable to Plaintiffs, the nonmovants, there is a triable question of fact concerning Davis and Suits' knowledge of the shower conditions. Per their own testimony, they did nothing about the complaints, because (they assert) they never received or were aware of the complaints. As an officer, Barnard would have had even more opportunities to observe any inadequate conditions in the bathrooms. Although Davis, Suits, and Barnard deny much of Plaintiffs' testimony, "summary judgment is not a procedure for resolving a swearing contest." *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). Without more, the court cannot grant summary judgment for Davis, Suits, or Barnard.[9]

## C. Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in

---

[9] Defendants concede that there is a triable issue of fact regarding Barnard's treatment of Tessman and do not seek summary judgment on Tessman's claims against Barnard. (Doc. 74 at 2)

the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S. Ct. 348, 350 (2014).

For the reasons discussed above, taken in the light most favorable to Plaintiffs, the facts do not show that Bates and Godinez violated Plaintiffs' Eighth Amendment rights. However, there is a genuine issue of material fact as to whether Barnard, Suits, and Davis violated Plaintiffs' rights as to the condition of the showers at Dixon Springs. Further, as made clear by the cases cited above, Plaintiffs' Eighth Amendment rights are clearly established in this context. Therefore, qualified immunity is not available to Barnard, Suits, and Davis at this stage.

### IV. CONCLUSION

For these reasons, Defendants' motion for summary judgment (Doc. 73) is

GRANTED in part and DENIED in part. The motion is GRANTED as to all of Plaintiffs' claims against Defendants Bates and Godinez. As to Plaintiffs' claims against Defendants Barnard, Suits, and Davis relative to the condition of the showers at Dixon Springs, the motion for summary judgment is hereby DENIED. As to all other of Plaintiffs' claims directed to Barnard, Suits, and Davis, the motion for summary judgment is hereby GRANTED. By separate order, the Court will set a status conference to discuss scheduling matters. The parties shall be prepared to discuss trial dates and whether a settlement conference would be fruitful. At the close of the case, the Clerk of Court shall enter judgment in favor of Defendants Bates and Godinez.

The Court wishes to remind Plaintiffs that litigation is often viewed as a series of hurdles that Plaintiffs must clear to get to another hurdle. Summary Judgment is such a hurdle, but it is a very low one for Plaintiffs to clear. Clearing the Summary Judgment hurdle does not mean that Plaintiffs have won their case nor does it mean that they are entitled to damages or other relief. As noted above, clearing the summary judgment hurdle only requires the existence of a disputed fact material to the Plaintiffs' claim. At trial, they will need to prove that the disputed fact did, in fact, occur as the Plaintiffs say it occurred. Trial is the highest and most difficult of hurdles for any Plaintiff to clear.

**SO ORDERED.**

Dated: July 15, 2021

DAVID W. DUGAN
United States District Judge